ORIGINAL

FILED-USDC-NDTX-DA
'26 OCT 30 PM1:27
JJF

SEALED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* TIM BOOHER, Relator, | § | **Civil Action 4:25-cv-00769-P** |
| Plaintiffs, | § | **AMENDED COMPLAINT UNDER THE FEDERAL FALSE CLAIMS ACT** |
| v. | § | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)** |
| LOCKHEED MARTIN CORPORATION, | § | |
| Defendant. | § | |

## INTRODUCTION

1. This is a *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.* Relator Tim Booher brings this action, on behalf of the United States, in order to vindicate two critically important, and mutually reinforcing, Government interests: ensuring that federal contractors entrusted with helping the Government protect the safety and security of the Nation fulfill their legal and contractual responsibilities, and ensuring that our Nation's workplaces are free from invidious racial discrimination and that employers hire and promote individuals on the basis of merit.

2. Protecting the safety and security of the Nation and the People through national defense are of the utmost importance to the Government.

3. Indeed, the Government spent nearly $1 trillion on defense in 2024, and the Department of Defense's proposed budget for fiscal year 2026 is nearly $1 trillion.

4. To support the national defense, the Government contracts with private companies for the research, development, and production of defense services and products, including stealth bombers, fighter jets, and missile systems.

5. To maintain the effectiveness of the Nation's defense and successfully combat its adversaries, a merit-based approach to employing individuals working in the defense industry is critical.

6. Relator, a former high-ranking employee of LMC, brings this *qui tam* action under the FCA to vindicate the Government's interest in preventing invidious racial discrimination.

7. LMC, a major defense contractor that supplies the Government with billions of dollars in defense services and products every year, including but hardly limited to the F-35, F-16, and F-22 aircraft, has engaged in a secret scheme of racial discrimination that blatantly violates Federal Acquisition Regulation ("FAR") 52.222-26, which states that a federal contractor "shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, sexual orientation, gender identity, or national origin."

8. Relator not only witnessed these illegal racially discriminatory practices but questioned them. As a result, he was threatened with legal and employment consequences if he refused to participate.

9. With respect to year-end bonuses and career advancement opportunities, LMC purposely replaced highly rated, well-qualified white employees with minority employees who ranked lower on a painstakingly prepared employee performance ratings list for no reason other than that those employees were minorities.

10. Second, LMC made hiring and promotion decisions based on race and Relator was required to do the same. In many instances, the people who were hired or promoted were either not qualified, or were less qualified than non-minority candidates who were passed over.

11. These racially discriminatory practices were clearly unlawful and in violation of FAR 52.222-26.

12. Nevertheless, despite engaging in invidious racial discrimination, LMC continued to invoice the Government for its work under its government contracts while certifying, either explicitly or implicitly, that it was complying with FAR 52.222-26.

13. The Government must not subsidize unlawful discrimination. Defendant should not profit through the public fisc while engaging in blatantly discriminatory practices.

14. As the Department of Justice recently explained in a May 19, 2025 memo from the Deputy Attorney General, "[t]he False Claims Act is ... implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racial preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin." *Memorandum re Civil Rights Fraud Initiative,* Todd Blanche, Deputy Attorney General, DEPT. OF JUSTICE (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl?inline. That is what LMC did.

15. Relator thus brings this *qui tam* suit to vindicate the United States' interests in stopping Defendant from engaging in illegal racially discriminatory practices, including DEI practices, while falsely certifying otherwise.

**PARTIES**

16. Relator Tim Booher ("Relator" or "Booher") was Vice President of Combat Systems at LMC. Booher was employed at LMC from April 2021 until May 2023. He is a technical advisor in the United States Air Force Reserve and a graduate of Massachusetts Institute of Technology and the Air Force Institute of Technology. Booher currently resides in Fort Worth, Texas. Relator voluntarily provided the information contained in this Complaint to the Government before filing this action—specifically, to a senior official in the Civil Rights Division at the Department of Justice.

17. Defendant Lockheed Martin Corporation ("LMC" or "Defendant") is a global security and aerospace company principally engaged in the research, design, development, manufacture, integration and sustainment of advanced technology systems, products, and services. LMC is a Maryland corporation and its principal place of business is in Bethesda, Maryland.

## JURISDICTION AND VENUE

18. This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.* Therefore, this Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331.

19. Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) because LMC transacts business in the Northern District of Texas and many of the acts proscribed by the FCA occurred in this District.

## LEGAL FRAMEWORK

20. The FCA prohibits individuals from, among other acts, "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

21. It also prohibits individuals from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(2)(B).

22. The Act defines a "claim" as, relevant here, "any request or demand, whether under a contract or otherwise, for money or property ... [that] is presented to an officer, employee, or agent of the United States." *Id.* § 3729(b)(2).

23. The Act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

24. Persons who violate the FCA are liable to the Government not only for a civil penalty, but also for "3 times the amount of damages which the Government sustains because of the act of that person." *Id.* § 3729(a)(1).

## FACTUAL ALLEGATIONS

### Background

25. The vast majority of LMC's business is with the U.S. Department of Defense and U.S. federal government agencies. It conducts this business through contracts with the federal government. On information and belief, one term of all of those contracts is that LMC will comply with FAR 52.222-26.

26. On information and belief, one term of all of LMC's pre-2025 contracts with the Government was that LMC must comply with Executive Order 11246's non-discrimination provisions. *See* 30 Fed. Reg. 12319 (Sept. 28, 1965).

27. On information and belief, LMC receives payment for its performance of those contracts by regularly submitting invoices that, among other things, certify its compliance with FAR 52.222-26.

28. LMC contracts with the federal government across four business segments: (1) Aeronautics, (2) Missiles and Fire Control, (3) Rotary and Mission Systems, and (4) Space.

29. LMC's Aeronautics segment is engaged in research, design, development, manufacture, integration, sustainment, support and upgrade of advanced military aircraft, including combat and air mobility aircraft, unmanned air vehicles, and related technologies.

30. The major projects of LMC's Aeronautics segment include: the F-35 stealth fighter; Skunk Works;[1] cargo aircraft; and other fighter aircraft, including the F-16 and F-22.

31. Aeronautics is of prime importance to LMC and is consistently the company's most profitable segment. In 2022, Aeronautics yielded $26.987 billion in net sales.

32. In particular, the F-35 is LMC's largest program. In 2022, for example, it alone accounted for 27% of LMC's $65.984 billion in total consolidated net sales. In other words, the F-35 program made $17.8 billion in total consolidated net sales.

33. Many of LMC's most critical operations with respect to engineering, technology, and manufacturing are located in Texas. The company employs several thousand workers through major facilities in Fort Worth, Grand Prairie, and Lufkin. The current home of LMC's F-35 Lightning II production is at the Air Force Plant 4 in Fort Worth. This production facility alone stretches more than one mile long and produces over 150 aircraft a year.

34. LMC's Engineering and Technology ("E&T") Combat Systems team is responsible for developing and sustaining all electronic, computational systems enabling combat and mission effectiveness for all platforms across Aeronautics.

35. With respect to the employment of Combat Systems team members, LMC's public-facing documents insist that the company does not discriminate against employees or applicants on the basis of race. For example, LMC's 2022 Corporate Policy Statement CPS-003 stated that a "key component of the company's commitment to equal opportunity is zero tolerance for discrimination and workplace harassment ... based on, or because of, race." CORPORATE POLICY STATEMENT CPS-003: NONDISCRIMINATION AND EQUAL EMPLOYMENT

[1] Skunk Works is LMC's Advanced Development Programs (ADP) organization. It is focused on future systems, including unmanned and manned aerial systems and next generation capabilities for air dominance, hypersonics, intelligence, surveillance, reconnaissance, situational awareness and air mobility.

OPPORTUNITY 3, LOCKHEED MARTIN CORP. (Aug. 18, 2022), https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/suppliers/news-eeo-2019-cps-003.pdf.

36. By way of another example, in accordance with FAR 52.222-26(c)(4), LMC's job postings stated that qualified applicants would receive consideration for employment without regard to race.

37. LMC's behind-the-scenes actions, however, tell a very different story.

**LMC's Discriminatory Bonus/Career Advancement Nomination Process**

38. One of Relator's responsibilities as VP of Combat Systems was to work with his executive team to rank the Combat Systems workforce.

39. The purpose of this ranking system was to distribute end-of-year financial bonuses and career advancement opportunities across the Combat Systems workforce.

40. The process for ranking employees was complex. It took about a month to complete.

41. To start, every manager submitted lists of calibrated performance ratings from their team members that ranged from "needs improvement" to "exceptional."

42. These ratings were vetted in a multi-level calibration meeting involving peer groups, function leads, and business unit leaders to help ensure consistency and identify top-quartile talent.

43. After that vetting process was complete, managers performed a "talent review" for each employee, considering such criteria as performance, below-market pay in a critical skill area, and succession plans on high priority projects where loss risk was high. The managers carefully and thoroughly documented the justification they offered for each employee's ultimate rating.

44. After managers had completed their reviews, a small committee of vice presidents met in order to validate each justification, prioritize each nomination against the total budget, and reallocate any unused discretionary budget.

45. The final product of this complex process was a ranked list of Combat Systems employees, the top 20% of whom were designated "Comp Adders." The list was maintained through a collection of spreadsheets that remained within the control of LMC's Human Resources ("HR") Department, and in particular Aero HR Director A and Aero HR Manager A.

46. Relator and his executive team took the ranking process seriously because it had significant long-term effects on their employees' careers. Specifically, Comp Adder-designated employees were awarded more significant bonuses and career advancement opportunities than their colleagues. The remaining 80% of the workforce, by contrast, typically was awarded an inflation-only bonus and was not eligible to participate in LMC's leadership or career advancement programs.

47. In 2022, Relator and his team finished the Comp Adder process sometime before December 9, 2022. They had worked hard to develop performance-based nominations that were carefully documented, consistent with integrity and mission focus, and free from unconscious racial bias. Relator was proud of the final product and confident he could justify every ranking in good faith and as a matter of mission-aligned merit.

48. Despite his thoughtful analysis, Relator's Comp Adder nominations were met with significant opposition from his superior, a Vice President in the Aeronautics business (AERO VP A), as well as HR Director A and HR Manager A.

49. The stated reason for their opposition to Relator's merit-based recommendations was that Relator's list did not include enough "people of color."

50. Relator found VP A's opposition particularly disconcerting, given that VP A had recently approved the very same Comp Adder list. But as VP A made clear to Relator, acceding to HR's race-based demands was simply LMC's standard operating procedure.

51. VP A informed Relator that he, too, would "get used to" complying with LMC's discriminatory decisions.

52. On December 9, 2022, HR Director A and HR Manager A informed Relator that he would need to change the racial make-up of the Comp Adder list.

53. Specifically, HR Director A and HR Manager A told Relator to remove at least 18 white employees from the Comp Adder list and substitute them with a corresponding number of minority employees for the purpose of increasing the racial diversity of the list.

54. HR Director A and HR Manager A suggested Relator take a hard look at the so-called "cuspers"—that is, employees who ranked either right above or right below the 20% cut-off mark—and switch out the lowest performing whites who had made the cut with the highest performing minorities who had not. The only stated rationale for pressuring Relator to make these changes concerned the racial composition of the Comp Adder list.

55. From December 9 through December 11, 2022, Relator sent multiple emails to HR Director A and HR Manager A expressing confusion and concern with their race-based directive. He repeatedly explained that he and his team had already conducted a thorough evaluation of the Combat Systems workforce, and that the final Comp Adder list prioritized racial diversity as much as it could without compromising the merit and integrity of the process.

56. During that same time period, Relator also participated in a telephone conference with HR Director A and HR Manager A in which he continued to express confusion and concern. He explained that there were no more minority candidates whose experience and qualifications

positioned them after evaluation right below the cut-off mark. In other words, he would have to dip considerably into the rankings and select employees for the Comp Adder List who fell significantly below the acceptable standards for current competence and projected future performance.

57. HR Director A and HR Manager A responded to Relator with disinterest and disdain. They had no interest in evaluating the employees' relative strengths or weaknesses, nor did they care to learn about them. From HR's perspective, the overriding priority was to make sure the Comp Adder list had "enough" minorities and not "too many" whites. HR Director A and HR Manager A made clear to Relator that he was not permitted to question whether the racial swaps were ethical or legal, and that his input would be of no consequence to LMC's employment processes.

58. Further, HR Director A told Relator that if he did not comply with the race-based swaps, he would face "legal activity." For good measure, she added that any failure to make the racial swaps would be unprecedented. Based on these statements from HR, and on information and belief, intentional discrimination against whites was LMC's official policy and infected LMC's operations, including all operations relating to fulfillment of contracts with the Government.

59. At no point did Relator's superiors or anyone from HR consider the business necessity of a merit-based Comp Adder nomination process instead of a race-based one.

60. On the contrary, HR Director A indicated that the racial make-up of Relator's original Comp Adder list was itself indicative of racial bias and therefore needed to be changed.

61. HR informed Relator that the Comp Adder process, including in particular the 18 race-based swaps that he was directed to make, were to be kept secret from his team members.

62. Relator's unambiguous impression was that HR Director A and HR Manager A were anxious to keep the process secret because they wanted to hide the racial reallocation as dictated and without oversight.

63. Indeed, Relator was reprimanded by HR Director A for sending a team-wide email that vaguely alluded to the race-consciousness of the Comp Adder nomination process, and HR instructed Relator to send a follow-up communication touting the alleged objectivity of the process.

64. HR Director A also repeatedly complained to Relator's subordinate about Relator's slowness to get on board LMC's race-based program.

65. So great was Relator's concern with the unlawfulness of LMC's behavior, he raised his concerns with a number of work colleagues, including a member of LMC's legal department ("Attorney A"); a Human Resources Vice President ("HR VP A"); an HR Director in another LMC business area ("HR Director B"); and four other VPs in other business areas outside the Aeronautics business (VPs B through E).

66. HR VP A dismissed Relator's concerns and communicated to Relator that LMC's race-based policies were there to stay and should not be questioned by a mere engineer.

67. VP D and HR Director B confirmed to Relator that the same kind of race-based Comp Adder swaps had also been forced on LMC's Space and Rotary and Missions Systems business segments.

68. On information and belief, VP C passed Relator's concerns on to a Senior Vice President at LMC, but to no avail. Shortly thereafter, a business area President reached out to Relator, professing to share his worry about LMC's policies. However, on information and belief, he never pursued his supposed concerns.

69. Of all the coworkers Relator spoke to about his concerns with HR's race-based directive, only two expressed genuine sympathy and outrage that such racial discrimination would be present and officially sanctioned at LMC.

70. By May 2023, Relator felt that he could no longer be complicit in LMC's illegal discrimination. He resigned from the company that month.

71. Around July 2024, Relator spoke with Equal Employment Opportunity Commission ("EEOC") Commissioner Andrea Lucas about LMC's discriminatory behavior with respect to the Comp Adder list. He explained to Lucas the relevant facts, the concerns he expressed to LMC about LMC's unlawful racial discrimination, and LMC's willful and repeated dismissal of those concerns.

72. LMC's swap of 18 white employees for 18 minority employees on the Comp Adder list[2] was a blatant violation of FAR 52.222-26, which prohibits employment actions on the basis of race.

73. LMC's race-based decisions were also a clear violation of Executive Order 11246, 30 Fed. Reg. 12319 (Sept. 28, 1965), which mandated that government contractors will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin.

**LMC's Discriminatory Hiring/Retention Process**

74. On information and belief, HR was focused on achieving certain racial demographics in LMC's workforce. In addition to being coerced into making race-based Comp Adder nominations, Relator was also asked to engage in race-based hiring decisions.

---

[2] On information and belief, once Booher informed HR that he could no longer acquiesce in its race-based demands, HR pressed Booher's Deputy to continue making race-based swaps on the Comp Adder list.

75. LMC's requirement that Relator hire and promote candidates based on race and for the purpose of increasing its racial diversity was a violation of FAR 52.222-26 and Executive Order 11246, 30 Fed. Reg. 12319 (Sept. 28, 1965), which disallow discrimination in employment.

**LMC Falsely Certified Compliance with FAR 52.222-26**

76. On information and belief, LMC has entered into hundreds of contracts with the Government across all four platforms of its Aeronautics business segment.

77. LMC's contracts take many forms, including (but not limited to): cost plus fixed fee contracts; cost plus award fee contracts; cost plus incentive fee contracts; fixed-price incentive (firm-target) contracts; and firm fixed price contracts.

78. A representative sample of LMC's F-35 related contracts with the Government includes: N00019-18-C-1004, N00019-19-C-0010, N0001919F2474, N00019-20-C-0037, N00019-22-C-0041, N00019-23-C-0009, N00019-22-C-0062.

79. On information and belief, one term in all of LMC's contracts with the Government is that LMC will comply with FAR 52.222-26, which states that a federal contractor "shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, sexual orientation, gender identity, or national origin."

80. FAR 22.810(e) requires that this nondiscrimination clause be included in every government contract.

81. On information and belief, LMC's invoices for payments under its federal contracts that it regularly sends to the Government certify compliance with the terms of the relevant contract, including compliance with the nondiscrimination provision.

82. On information and belief, LMC's repeated discrimination on the basis of race, as set forth above, render its claims of compliance with FAR 52.222-26 false.

83. LMC is a highly sophisticated company and well-attuned to its legal responsibilities. On information and belief, LMC's repeated submission of invoices falsely certifying nondiscrimination at the same time it was engaging in multiple blatant violations of FAR 52.222-26 and Executive Order 11246 was done knowingly. On information and belief, LMC had actual knowledge that its certifications of compliance with employment nondiscrimination laws were false. At an absolute minimum, when it submitted invoices for payment under its Government contracts, LMC (1) acted in deliberate ignorance of a substantial risk that the employment practices described in this Complaint were illegal, or (2) acted in reckless disregard of the truth or falsity of the certifications it made when submitting the invoices while aware of a substantial and unjustifiable risk that those employment practices did not comply with FAR 52.222-26 or Executive Order 11246. That LMC acted knowingly in falsely certifying its compliance with FAR 52.222-26 and Executive Order 11246 is evidenced by, among other things, its insistence on keeping the Comp Adder racial swaps a secret.

**LMC's False Claims of Compliance with FAR 52.222-26 are Highly Material to the Government**

84. Civil Rights violations, particularly in the employment arena, have long been of grave concern to the federal government.

85. Since 1941, government contractors have been prohibited by Executive Order from engaging in employment discrimination based on race, color, or national origin, *see* 3 C.F.R. 957 (1938-1943) (Executive Order 8802 (June 25, 1941), and since at least 1961, contractors have been expressly subject to sanctions for engaging in racial discrimination. *See* 3 C.F.R. 448 (1959-1963) (Executive Order 10925 (March 6, 1961).

86. Beginning with the Civil Rights Act in 1866, which banned racial discrimination in contracting, Congress has continued to combat racial discrimination through successive legislation across all areas of public and private life.

87. Eliminating and redressing racial discrimination continues to be a central feature of the federal government's mission: the Justice Department's Civil Rights Division enforces laws banning discrimination based on race and color (among other protected traits), while the Equal Employment Opportunity Commission (EEOC) is tasked with enforcing federal employment discrimination statutes. Because of the Government's bedrock commitment to equality, a contractor's violation of its employees' civil rights necessarily goes right to the essence of the bargain between the government and that contractor. It is incontrovertible, therefore, that, in response, the Government must—and does—change course. At a minimum, given the importance the Government has, at all relevant times, attached to contractor compliance with employment nondiscrimination laws, such a contractor's violation would influence or be capable of influencing the Government's decision regarding the payment of claims submitted by the contractor.

88. On information and belief, the government routinely seeks to cancel federal contracts where it finds evidence that the contractor has engaged in illegal employment discrimination. In 2011, for example, the Government sought to cancel contracts with Cargill Meat Solutions after uncovering evidence that CMS had engaged in race discrimination. In 2017, moreover, the Government sought to cancel contracts with Pilgrim's Pride Corporation, also because Pilgrim's Pride Corporation was discriminating based on race.

89. More recently, Executive Order 14173 reiterated that the Government does not tolerate racially discriminatory practices in the public or private sector. *See* 90 Fed. Reg. 8633 (Jan. 21, 2025).

90. On information and belief, the federal Government will not pay or otherwise enter into contracts with contractors who violate FAR 52.222-26.

91. For all of these reasons, LMC's certifications of its compliance with FAR 52.222-26 while at the same time it was engaging in repeated, blatant, and costly violations of those laws were not only false, they were material to the Government's decision to pay LMC. LMC's false claims and certifications regarding its compliance with FAR 52.222-26 not only had a natural tendency to influence, or to be capable of influencing, the Government's payment decisions, LMC, on information and belief, also knew or had reason to know of the importance the Government attached to its compliance with those laws.

## CLAIMS

### Count I
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

92. Relator realleges and incorporates the allegations contained in paragraphs 1 through 91 of this Complaint.

93. LMC has billed the Government under its Aeronautics business segment contracts on a regular basis from their inception and will continue to do so throughout the pendency of this lawsuit. LMC has also billed the Government under its Missiles and Fire Control, Rotary and Mission Systems, and Space contracts on a regular basis from their inception and will continue to do so throughout the pendency of this lawsuit.

94. Each of these claims, since at least 2022 (and on information and belief, since 2020) and continuing through the pendency of this lawsuit, is a false or fraudulent claim for the reasons alleged above, including, but not limited to, on information and belief, LMC falsely certifying either explicitly or implicitly that it was complying with FAR 52.222-26.

95. On information and belief, all of these false claims were presented for payment or approval to employees of the Government.

96. The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

97. The explicit or implicit false certifications were material to the Government's payment decision.

98. LMC submitted these claims with the knowledge and intention that such claims would be presented to officers and employees of the Government for payment or approval. LMC did so with actual knowledge of the falsity of each claim, reckless disregard for the truth or falsity of each claim, or deliberate indifference to the truth or falsity of each claim.

99. Defendant thus knowingly presented, or caused to be presented, to an officer or employee of the Government or a member of the Armed Forces of the United States, false or fraudulent claims for payment or approval.

100. By virtue of these false or fraudulent claims, Defendant is liable to the United States for incurred damages resulting from their conduct, trebled, plus civil penalties for each violation of the FCA.

101. As a result of Defendant's violations, the United States has suffered damages in an amount to be determined at trial.

**Count II**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

102. Relator realleges and incorporates the allegations contained in paragraphs 1 through 101 of this Complaint.

103. LMC knowingly made, used, or caused to be made or used numerous false records or statements material to the false or fraudulent claims set forth above, and, on information and belief, will continue to do so throughout the pendency of this lawsuit.

104. Defendant thus knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims paid or approved by the United States Government.

105. Among other falsehoods, Defendant made, used, or caused to be made or used, false records suggesting that the employees it financially rewarded were the top 20% of the workforce based on a comprehensive, conscientious, merit-based process that was free of invidious racial discrimination. These false records were material to LMC's false claims.

106. By virtue of these false or fraudulent claims, Defendant is liable to the United States for incurred damages resulting from their conduct, trebled, plus civil penalties for each violation of the FCA.

107. As a result of Defendant's violations, the United States has suffered damages in an amount to be determined at trial.

**RELIEF**

108. WHEREFORE, Relator prays for judgment against Defendant as follows:

a. That the Court order that Defendant cease and desist from violating 31 U.S.C. § 3729 *et seq.;*

b. That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus interest and the maximum civil penalty for each violation of 31 U.S.C. § 3729;

c. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d. That Relator be awarded all costs of this action, including pre- and post-judgment interest, attorneys' fees and expenses, pursuant to 31 U.S.C. § 3730(d); and

e. That Relator recover such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

109. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

Date: October 29, 2026

Respectfully submitted,

*/s/ Marcella Burke*
Marcella Burke
marcella@burkegroup.law
Patrick Kenneally
Patrick.kenneally@burkegroup.law
Connor Mighell
Connor.mighell@burkegroup.law
**Burke Law Group, PLLC**
1000 Main St., Suite 2300
Houston, Texas 77002
T: (832) 987-2214

David Thompson*
dthompson@cooperkirk.com
Vince Colatriano*
vcolatriano@cooperkirk.com
Johanna Einterz*
jwebber@cooperkirk.com
**Cooper & Kirk, PLLC**
1523 New Hampshire Ave. NW
Washington, DC 20036
T: (202) 220-9600

**Pro hac vice* applications forthcoming

***Counsel for Relator***